■ In the Matter of the Estate of FRANK J. LYMON, Deceased. ELIZABETH W. LYMON, Respondent, v EMIRA E. LYMON, Appellant, and ZOLA M. TAYLOR, Respondent.—Decree of the Surrogate's Court, New York County (Marie M. Lambert, S.), entered on or about December 8, 1988, which awarded, with restriction, letters of administration upon the estate of Frank J. Lymon to petitioner-respondent Elizabeth Waters Lymon, unanimously reversed, on the law and the facts, and respondent-appellant Emira Eagle Lymon awarded letters of administration for said estate, without costs.

The Surrogate awarded letters of administration to petitioner-respondent based upon her finding that petitioner had established, by clear and convincing evidence, that she and the deceased, Frank J. Lymon, had contracted a valid com-

mon-law marriage in the State of Pennsylvania prior to the deceased's marriage to respondent-appellant Emira Eagle Lymon. Upon review of the record, however, we find that petitioner's evidence was insufficient to overcome the very strong presumption favoring the validity of the deceased's second, ceremonial marriage to respondent Emira Eagle Lymon *(Matter of Seidel v Crown Indus.,* 132 AD2d 729, 730 [3d Dept 1987]; *Matter of Esmond v Lyons Bar & Grill,* 26 AD2d 884 [3d Dept 1966] ["when the asserted invalidity of a second marriage inheres in the alleged impediment of the continued vitality of the first marriage, an even stronger presumption arises in favor of the validity of the second marriage"]).

Petitioner's evidence that she and Frank Lymon had entered into a valid common-law marriage in the State of Pennsylvania prior to respondent's June 1967 marriage to Lymon was neither clear nor convincing. Frank Lymon, whose 1956 recording of "Why Do Fools Fall in Love?" had made him a recording and performing star, met petitioner, who is from Philadelphia, at the Audubon Ballroom in New York some time in 1963. Shortly thereafter, they began living together in Manhattan, holding themselves out as husband and wife, despite the fact that petitioner was still married to Charles Phillips, the father of her daughter, who was then serving in the Armed Forces.

In November 1963, petitioner gave birth to Lymon's child, but the infant died soon after birth. On December 10, 1963, petitioner filed for divorce from Charles Phillips in Pennsylvania. Before Phillips' time to answer had expired, petitioner and Lymon took part in a purported civil marriage ceremony in Alexandria, Virginia, on January 23, 1964. On the application for the Virginia marriage license, petitioner indicated that she was "single" and had never been previously married. She testified at trial that she had been advised by her Pennsylvania attorney, who was deceased at the time of trial, in a telephone conversation in late December 1963, that she was free to marry Lymon. Nevertheless, petitioner did not indicate "divorced" as her true marital status because she wanted to avoid any "confusion" which might have delayed her marriage to Lymon. However, Lewis Lymon, Frank's brother, testified that at the time petitioner was preparing for the purported Virginia marriage, she admitted her concern that she might be liable to criminal prosecution for bigamy. This marriage was, in fact, bigamous, as petitioner's divorce from Phillips did not become final until December 1965.

Petitioner concedes the invalidity of the Virginia marriage,

but claims that she and Lymon thereafter lived in Philadelphia as husband and wife, giving rise to a valid common-law marriage recognized by the State of Pennsylvania. A person who, while still married to another, enters into a subsequent marriage "in good faith in the full belief * * * that the former marriage has been annulled or terminated by a divorce" and thereafter lives with the party to the second marriage as husband and wife, is deemed under Pennsylvania law to have been legally married from the time the impediment to the later marriage is removed. However, the parties to the later marriage must "continue to live together as husband and wife" after termination of the prior marriage. (48 Pa Cons Stat § 1-17.)

Despite substantial evidence to the contrary, the Surrogate found that petitioner entered into her marriage with Frank Lymon in good faith. Even if we were to accept this determination, other evidence presented at trial negates the Surrogate's finding that petitioner and Lymon lived together as husband and wife in Philadelphia either before or after December 1965 when petitioner's first marriage terminated in divorce.

According to petitioner's own testimony, she lived with Lymon in New York City during 1964 and 1965. In the summer of 1965, Lymon left for California following a serious fight with petitioner. This breakup was confirmed by Lymon's brother Lewis and two of his aunts, who claim that Lymon never resumed relations with petitioner after this time. While in California, Lymon lived with respondent-respondent Zola Mae Taylor. Although petitioner traveled to California in the fall of 1965 to attempt a reconciliation with Lymon, the attempt was not successful. Lymon continued to live with Zola in Los Angeles until she left to rejoin her former singing group, The Platters, in December 1965. By her own admission, Zola never saw Frank Lymon again.

Petitioner claims that her relationship with Lymon resumed in February 1966. She allegedly lived with Lymon in Philadelphia. However, arrest records for both Lymon and petitioner during that time give New York City addresses for each of them. In June 1966 Lymon was arrested in New York and, according to petitioner, sentenced to several months' imprisonment. As a condition of his release he entered the armed services in November 1966 and was sent to Fort Gordon, Georgia. There he met respondent Emira Lymon and married her in a church wedding in June 1967.

Petitioner claims that Lymon left Georgia eight or more

times to visit her in New York and Philadelphia while he was in the Army. Lymon's Army records, however, show that he was reported AWOL several times for one-day periods or less, but that he was not absent for extended periods. These records, coupled with the fact that Lymon was only a private and an allotment from his salary was sent each month to his grandmother, make petitioner's claim that he frequently traveled great distances to New York and Philadelphia highly questionable. Petitioner's claims appear completely incredible in view of her previous deposition testimony taken in a Federal court proceeding which was used to impeach her testimony in Surrogate's Court.

In her deposition, petitioner maintained that Lymon had sought a reconciliation with her after she returned from California but that she refused because of Lymon's continued heroin use. She told him that she "would possibly consider reconciliation after a two-year army stay." More importantly, petitioner emphatically denied that she lived in Philadelphia after she met Lymon in the summer of 1963. According to petitioner, she moved to New York City and "I never ever came back to live in Philadelphia for no period of time." Thus, petitioner's assertions of a valid Pennsylvania common-law marriage are belied by her previous deposition testimony.

Given this record, we find that petitioner did not meet the heavy burden of proving that she and Lymon entered into a valid common-law marriage in Pennsylvania following her divorce in December 1965. Given the presumption of validity which attaches to Lymon's second marriage to respondent, we reverse the Surrogate's decree and direct entry of a decree in favor of respondent Emira Eagle Lymon. Concur—Sullivan, J. P., Carro, Asch and Rosenberger, JJ.